UNITED FIRE & CASUALTY COMPANY, Plaintiff,

v.

Robert J. ARMANTROUT, Sr., Defendant–Appellant and Cross–Appellee,

and

National Union Fire Insurance Company, a Pennsylvania corporation, and Combined Insurance Company of America, an Illinois corporation, Defendants–Appellees and Cross–Appellants.

Nos. 93CA1614, 93CA1617.

Colorado Court of Appeals, Div. V.

April 20, 1995.*

Rehearing Denied May 25, 1995.

Certiorari Denied Oct. 30, 1995.

---

* Sitting by assignment of the Chief Justice under provisions of the Colo. Const. art. VI, Sec. 5(3), and § 24–51–1105, C.R.S. (1994 Cum.Supp.).

* Prior opinion announced February 23, 1995, *WITHDRAWN*. Petitions for Rehearing *GRANTED*.

Hugh D. Wise, III, Aspen, for defendant-appellant and cross-appellee.

Greengard Senter Goldfarb & Rice, Mark C. Overturf, Cynthia C. Goettle, Denver, for defendant-appellee and cross-appellant National Union Fire Ins. Co.

Elder & Phillips, P.C., Keith Boughton, Grand Junction, for defendant-appellee and cross-appellant Combined Ins. Co. of America.

Opinion by Chief Judge STERNBERG.

Defendant, Robert J. Armantrout, Sr., was injured in two separate accidents, both of which occurred while in the course of his employment. His employer, Combined Insurance Company of America, through its insurer, National Union Fire Insurance Company, (subrogees) paid him workers' compensation benefits. Armantrout sued a third-party tortfeasor seeking damages for his injuries. He settled that case. When the parties to this appeal disagreed as to the amount, if any, of the settlement that was to be subject to the subrogees' claim, the tortfeasor's insurer brought this interpleader action. Both Armantrout and the subrogees appeal the judgment entered by the trial court. We reverse and remand with directions.

In September 1984, while in the course of his employment, Armantrout sustained a severe injury to his elbow when he slipped and fell at a motel. He applied for and received workers' compensation benefits from the subrogees for those injuries. In 1986, he filed suit against the owners of the motel.

While that suit was pending, Armantrout was badly injured in a one-car accident on April 1, 1988, also in the course of his employment. He again received workers' compensation benefits from the subrogees. Armantrout alleged that he fell asleep at the wheel and hit a bridge abutment because of pain medication he was taking and sleep deprivation he was experiencing due to the elbow injury. Therefore, he sought to recover damages against the motel owners for his injuries in both accidents.

On April 14, 1988, Armantrout and the subrogees entered into an assignment agreement which provided, in part, that Armantrout would prosecute an action against third parties "who may be legally liable for his injuries, damages, and losses, as a result of his falling down the stairway at the [motel]," and that the subrogee insurer assigned to Armantrout its "claims against ... third parties who may be legally responsible to claimant for injuries, damages, and losses arising out of Claimant's fall ... at the ... motel." Armantrout agreed to hold in trust for the benefit of the subrogee insurer, and to pay to it from any gross recovery, a sum equal to the insurer's liability under the Workers' Compensation Act. The agreement also delineated how attorneys fees and costs would be allocated between the parties. The terms of the assignment agreement made no express reference to the automobile accident, which had occurred some two weeks earlier.

The trial on the suit against the motel owner resulted in a verdict in Armantrout's favor which, when reduced by comparative negligence, netted him $401,379.70. That jury also determined, in response to a special interrogatory, that none of Armantrout's total damages resulted from the automobile accident.

In January 1989, after receipt of the verdict, but prior to entry of judgment, Armantrout, the motel owner, and its insurer settled the case, and stipulated to vacating the verdict. By the terms of that settlement, Armantrout was to receive $495,000 as consideration for releasing the motel owners from all claims relating to the slip and fall in 1984 and the vehicular accident that occurred in 1988. The agreement, however, did not allocate the total amount between the two accidents or specify what amount, if any, compensated Armantrout for damages such as pain and suffering. The $495,000 settlement figure was the product of negotiation between the parties, the amount in excess of the jury verdict of $401,379.70 being attributable to part of the interest and costs that had accrued.

Relying upon the statute, § 8–41–203(1), C.R.S. (1994 Cum.Supp.), and the assignment agreement, the subrogees asserted both a statutory and contractual subrogation lien as to workers' compensation benefits paid to Armantrout for injuries sustained in both accidents. Armantrout acknowledged the validity of the lien for benefits attributable to the first accident but not the second.

Faced with conflicting claims to the settlement proceeds, the insurer for the motel owners filed this interpleader action pursuant to C.R.C.P. 22. It deposited $110,000, the total amount of compensation benefits that had been paid up to that time on both accidents, into the registry of the district court for determination of how those funds should be allocated between Armantrout and the subrogees. Thereafter, from that deposited amount, the subrogees were paid $56,000 for the workers' compensation benefits they had paid for the first accident, less attorney fees of approximately $14,000.

Armantrout moved for summary judgment in the interpleader action, claiming that he had not recovered any funds from the motel owners for the automobile accident against which the subrogees could assert a lien. Based largely on its interpretation of the jury's answer to the special verdict interrogatory, the trial court agreed and granted the motion.

On appeal by the subrogees, a division of this court reversed. *Armantrout v. Combined Insurance Co.* (Colo.App. No. 89CA1110, January 3, 1991) (not selected for official publication). That opinion held that the jury verdict merged into and was supplanted by the settlement agreement; thus, the trial court erred in relying on the verdict as the basis for its order of summary judgment. The case was remanded for determination of the merits of the subrogation lien asserted by the subrogees related to the automobile accident.

After remand, Armantrout filed a motion seeking a determination of the extent of the subrogees' potential recovery should the lien be found valid. In response to this motion and prior to submitting the case to the jury, the trial court found that the assignment agreement governed both accidents; there-

fore, it concluded that apportionment of attorney fees and costs related to the automobile accident should be made pursuant to the terms of the agreement.

The case was tried to a jury which, in responding to a special interrogatory, concluded that Armantrout had recovered money from the settlement that compensated him for something "more than the injuries received in the slip and fall accident." Following that determination, the court, "sitting in equity," heard additional evidence and apportioned the $495,000 settlement amount between the two accidents. It allocated $401,380 to the slip and fall claim and $93,620 to the automobile accident.

The effect of the trial court's apportionment order was to prevent the subrogees from asserting a subrogation lien against the total recovery for both accidents. Significantly, the workers' compensation benefits that the subrogees had paid on the slip and fall case totalled some $56,000, while benefits paid on the automobile accident claim exceeded $300,000, and additional amounts would continue to be paid indefinitely. On appeal, both parties contend that the trial court erred in its determination of the extent of the workers' compensation lien.

I.

■ Because it is dispositive, and subsumes other contentions, we address first the subrogees' contention that the trial court erred by not making the entire $495,000 settlement amount subject to their workers' compensation subrogation lien. We agree with the subrogees and conclude that, pursuant to § 8–41–203(1), the lien may be asserted against the entire settlement.

The workers' compensation insurer's subrogation interest is defined by § 8–41–203(1), which provides:

If such injured employee ... elect[s] to take compensation under [the Workers' Compensation Act], the payment of compensation shall operate as and be *an assignment of the cause of action against the other person* to the ... insurance carrier liable for the payment of such compensation. Said insurance carrier shall not be

entitled to recover any sum in excess of the amount of compensation for which such carrier is liable under said articles to the injured employee, but to that extent said carrier *shall be subrogated to the rights of the injured employee against said third party causing the injury.* (emphasis added)

The supreme court explained the operation of this section in *Tate v. Industrial Claim Appeals Office,* 815 P.2d 15, 17 (Colo.1991):

> If the employee recovers from the tortfeasor, the employee must reimburse the insurer for any benefits paid.... The insurer may also offset any portion of the recovery not used to reimburse the insurer for past benefit payments against any future benefits the insurer may have to pay ... Under this approach the employee receives interim workers' compensation benefits, recovers from the tortfeasor, reimburses the insurer for the interim benefits, credits the insurer for potential future benefits and keeps the remainder as excess damages.

Under this rule, pursuant to § 8–41–203(1), the right of subrogation and assignment is not limited to the compensation which has been paid. Thus, the subrogees can offset its liability for future benefits against the amount of the settlement.

In the 1989 settlement agreement, Armantrout received $495,000 from the motel owners in exchange for releasing all claims related to *both* the slip and fall accident and the automobile accident. In doing so, he recovered a lump sum from the tortfeasor which was undifferentiated between the two accidents. Moreover, in response to a special interrogatory, the interpleader jury in this case determined that Armantrout had recovered in the settlement for more than just the slip and fall accident.

Accordingly, we hold that the subrogees' statutory subrogation lien applies to and may be satisfied from the total settlement amount recovered by Armantrout from the motel owners. Therefore, we conclude that the trial court erred in not allowing the subrogation lien to be asserted against the entire $495,000 settlement. In so ruling, we necessarily reject Armantrout's legal argument that no part of the settlement was available to be liened.

## II.

■ In a separate assertion, Armantrout argues that it is inequitable to recognize the subrogation lien here because it leaves him inadequately compensated for his separate damages related to the automobile accident. We are not persuaded.

Relying on *Hewitt v. Apollo Group,* 490 N.W.2d 898 (Minn.App.1992), Armantrout asserts that a workers' compensation insurer may not recover on its subrogation lien if such a recovery would result in inadequate compensation for the injured worker. However, the *Hewitt* case was decided under a statutory scheme which allowed the district court to allocate settlement proceeds between amounts which are lienable and non-lienable. Our workers' compensation statute has no such provision.

In enacting workers' compensation legislation, the General Assembly established a comprehensive statutory scheme for providing compensation for injured workers. Equitable arguments regarding the potential inadequacy of workers' compensation benefits are more appropriately addressed to the legislature than to the courts. *Christensen v. Oshkosh Truck Corp.,* 12 F.3d 980 (10th Cir. 1993).

## III.

■ Armantrout next contends that the subrogees cannot recover amounts which, under his personal automobile insurance policy, he would have been entitled to recover as personal injury protection (PIP) benefits pursuant to the No Fault Act, § 10–4–701, et seq., C.R.S. (1994 Repl.Vol. 4A). Relying on *Tate v. Industrial Claim Appeals Office, supra,* and *Peterson v. Kester,* 791 P.2d 1185 (Colo.App.1989), Armantrout argues that, if a workers' compensation insurer replaces a No–Fault Act insurer for primary coverage, the compensation insurer may not recover from the injured employee's settlement with a tortfeasor the amount of PIP benefits to which the employee would have been entitled had the accident not occurred within the

course and scope of employment. The subrogees respond that Armantrout's argument fails under the circumstances of this case because of the prohibition on recovery of direct PIP benefits contained in § 10–4–713(1), C.R.S. (1994 Repl.Vol. 4A) of the No–Fault Act. We agree with the subrogees.

Section 8–41–203(1), C.R.S. (1994 Cum. Supp.) provides that a workers' compensation insurer is subrogated to the rights of its insured and may recover from a tortfeasor benefits the insurer has paid to its insured. But, if the employee sustains injuries in a work-related automobile accident involving another motor vehicle, § 10–4–713(1) prohibits the injured worker from bringing suit against certain exempt tortfeasors to recover the PIP benefits and also precludes subrogation by the worker's insurer. This section states, in pertinent part, as follows:

> Neither any person eligible for direct benefits described in section 10–4–706 nor any insurer providing benefits described in section 10–4–706 shall have any right to recover against *an owner, user, or operator of a motor vehicle or against any person or organization legally responsible for the acts or omissions of such person* in any action for damages for benefits required to be paid under section 10–4–706. (emphasis added)

Section 10–4–713(1), C.R.S. (1994 Repl.Vol. 4A).

Armantrout sustained injuries in a single-car accident and then claimed in his suit against the motel owners that their tortious conduct had caused the accident. The motel owners were not an owner, user, or operator of a motor vehicle, nor were they responsible for the acts or omissions of an owner, user, or operator, as those terms are applied in this statute. Thus, under the terms of § 10–4–713(1), the motel owners were not exempt from suit by Armantrout for direct PIP benefits. Similarly, upon Armantrout's recovery from the motel owners, the subrogees were not precluded from seeking reimbursement by subrogation from the tortfeasor for the workers' compensation benefits which they had paid to Armantrout in lieu of PIP benefits.

Contrary to Armantrout's contention, *Tate* and *Peterson* do not require a different result. Both of those cases involved a third-party tortfeasor who was exempt, pursuant to § 10–4–713(1), from recovery to the extent of PIP benefits. Thus, this critical factual distinction reconciles our holding with those cases.

IV.

▇ Armantrout also contends that the trial court erred by ruling that the 1988 assignment agreement governs the allocation of attorney fees and costs related to both accidents. He urges that any recovery by the subrogees should be reduced by a *pro rata* allocation of attorney fees and costs. We agree.

In an order dated May 21, 1993, the trial court ruled that the 1988 assignment agreement was unambiguous and that it related to the attorney fees and costs for the automobile accident as well as the slip and fall accident.

▇ Interpretation of a written contract is generally a question of law for the court. Whether an ambiguity exists is also a question of law. *Pepcol Manufacturing Co. v. Denver Union Corp.*, 687 P.2d 1310 (Colo. 1984). Thus, a trial court's interpretation of a written contract is subject to independent reevaluation by an appellate court. *I.M.A., Inc. v. Rocky Mountain Airways, Inc.*, 713 P.2d 882 (Colo.1986).

Nowhere in the 1988 assignment agreement is the automobile accident mentioned, although it had occurred some two weeks earlier. On the other hand, the agreement is permeated with references to the slip and fall accident by date, by location, by name of the motel, and by the type of accident. Such references are repeated and specific and appear in both recital and numbered paragraphs of the agreement. In *Denver Joint Stock Land Bank v. Markham*, 106 Colo. 509, 513, 107 P.2d 313, 316 (1940), the court stated: "[S]pecific provisions of an agreement express more exactly what the parties intend than broad or general clauses." *See also Green Shoe Manufacturing Co. v. Farber*, 712 P.2d 1014 (Colo.1986) and *Colorado Farm Bureau Mutual Insurance Co. v. North American Reinsurance Corp.*, 802 P.2d 1196 (Colo.App.1990).

Applying this maxim, we conclude that it was not the intention of the parties that the

"boilerplate" language in the assignment agreement referring to all claims "arising out of" the slip and fall accident should extend the agreement to cover the automobile accident.

We conclude that the assignment agreement is unambiguous and that it applies only to the slip and fall accident. Therefore, there is no agreement as to allocation of attorney fees and costs to the automobile accident. There being no agreement between the parties concerning fees and costs relating to the automobile accident, we seek guidance from applicable case law.

 In *County Workers Compensation Pool v. Davis,* 817 P.2d 521, 526 (Colo.1991), the court applied the rule of equitable apportionment, explaining that:

> [A] contrary rule would require the employee to bear the litigation expenses for that very part of the recovery which the employee is obligated to pay over to the insurer, thereby resulting in a substantial pecuniary benefit to the insurer at the expense of the employee.

In *Kennedy v. Industrial Commission,* 735 P.2d 891 (Colo.App.1986), a division of this court reduced the insurer's subrogation credit against future benefits by the amount of attorney fees and costs incurred in settling the third-party action. That division reasoned that:

> [R]equiring claimant both to pay [insurer's] costs in recovering its subrogation interest and to offset those costs against his workmen's compensation benefits would amount to a double loss. To charge claimant twice with reasonably incurred expenses which inure to the carrier's benefit is inconsistent with the basic purpose of the Act, which is to benefit injured workers.

*Kennedy v. Industrial Commission, supra,* at 894. We adopt and apply this statement.

The rule of equitable apportionment is applicable to the circumstances of this case. Armantrout prosecuted a cause of action against the motel owners at his own expense, incurring attorney fees and costs totalling $147,140. Pursuant to the assignment agreement, Armantrout deducted approximately $14,000 for attorney fees and costs when he reimbursed the subrogees from the settlement proceeds for benefits they had paid related to the slip and fall injuries. The record indicates that defendants paid no other attorney fees or costs related to Armantrout's $495,000 recovery.

Under these circumstances, the basic purpose of the workers' compensation act would be violated if the subrogees can be reimbursed from the total settlement amount without allowing Armantrout to deduct a pro rata amount for attorney fees and costs. Therefore, on remand the trial court should apportion attorney fees and costs related to Armantrout's total recovery from the motel owners. If the trial court determines that Armantrout's reimbursement obligation to the subrogees exceeds the $495,000 recovery, then he would be entitled to a deduction of all attorney fees and costs. *See County Workers Compensation Pool v. Davis, supra.*

The other contentions of error are either subsumed within the discussion above or are without merit.

The judgment is reversed, and the cause is remanded for further proceedings consistent with this opinion.

ROTHENBERG and KAPELKE, JJ., concur.